**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION**

**CHARLIE GLASPER**                                                         **PLAINTIFF**

**v.**                                   **Case No. 2:15-cv-00186-KGB**

**CITY OF HUGHES, ARKANSAS;
LAWRENCE OWENS, INDIVIDUALLY and OFFICIALLY;
DUSTIN MCCLUSKEY, INDIVIDUALLY and OFFICIALLY;
JAMES WRIGHT, JR., INDIVIDUALLY and OFFICIALLY;
JAMES WRIGHT, SR., INDIVIDUALLY and OFFICIALLY; and
JOHN DOES 1-3, INDIVIDUALLY and OFFICIALLY**                 **DEFENDANTS**

## OPINION AND ORDER

On November 22, 2014, plaintiff Charlie Glasper had an encounter with officers of the City

of Hughes Police Department in Hughes, Arkansas.  On March 2, 2016, Mr. Glasper filed an

amended complaint pursuant to 42 U.S.C. §1983 and the Arkansas Civil Rights Act ("ACRA"),

codified at Ark. Code Ann. § 16-123-101, *et seq.*  Mr. Glasper alleges that his rights as secured by

the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States

were violated.  In his amended complaint, Mr. Glasper names five defendants, along with three

John Doe defendants who have yet to be identified:  the City of Hughes, Arkansas; Lawrence

Owens, individually and in his official capacity as the Mayor of the City of Hughes;[1] Dustin

McCluskey, individually and in his official capacity as the former Chief of Police for the City of

Hughes; James Wright, Jr.,[2] individually and in his official capacity as a police officer for the City

---

[1]  Defendants filed a suggestion of death on February 22, 2016, informing the Court that
on or about February 16, 2016, Mr. Owens died (Dkt. No. 14).

[2]  Defendants note that, for clarity in their filings, separate defendant James Jeremy Wright
will be referred to as "Officer Wright, Jr.," although James Jeremy Wright is not, in fact, a "Jr."

of Hughes; and James Wright, Sr.,[3] individually and in his official capacity as a police officer for the City of Hughes.

With respect to defendant the City of Hughes, Mr. Glasper alleges that these constitutional violations resulted from a custom, practice, or policy of the City of Hughes (Dkt. No. 18). Mr. Glasper contends that Chief McCluskey failed to train or supervise Officers Wright, Sr., and Wright, Jr. Mr. Glasper also alleges constitutional claims against Officer James Wright, Jr., and Officer James Wright, Sr., individually, and pendant state law tort claims against Officer Wright, Jr. These officers were at the scene on November 22, 2014. Specifically, Mr. Glasper alleges that Officer Wright, Jr., committed an unlawful assault and battery upon him, subjected Mr. Glasper to the intentional infliction of emotional distress, committed negligence and gross negligence, engaged in false arrest and imprisonment, carried out an abuse of process, engaged in a conspiracy, committed other torts, and committed *prima facie* tort (Dkt. No. 18, ¶ 27).

Before the Court are two motions for summary judgment. Defendants the City of Hughes, Arkansas, former Chief McCluskey, and former Mayor Lawrence Owens ("the City defendants") have filed a motion for summary judgment (Dkt. No. 27). The City defendants' motion also addresses Mr. Glasper's claims against Officers Wright, Sr., and Wright, Jr., in their official capacity (*Id.*). Defendants Officers Wright, Sr., and Wright, Jr., have filed a motion for summary judgment requesting judgment in their favor on Mr. Glasper's claims against them in their individual capacity (Dkt. No. 30). Mr. Glasper has responded to both motions (Dkt. Nos. 35; 37), and defendants have replied to Mr. Glasper's responses (Dkt. Nos. 41; 42).

---

[3] Defendants note that, for clarity in their filings, separate defendant James Lee Wright will be referred to as "Officer Wright, Sr.," although James Lee Wright is not, in fact, a "Sr."

In his responses to defendants' motions, Mr. Glasper concedes that defendants are entitled to summary judgment on his Fifth Amendment and Eighth Amendment claims "for the reasons set forth in the brief of the City defendants. . . ." (Dkt. No. 36, at 2; Dkt. No. 37, at 1). Therefore, summary judgment is granted in favor of all defendants, including all individual defendants sued in their individual and official capacities, on Mr. Glasper's Fifth Amendment and Eighth Amendment claims. The Court will limit its analysis to the claims to which Mr. Glasper responds, not those he concedes.

For the following reasons, the Court grants in part and denies in part defendants' motions for summary judgment (Dkt. Nos. 27; 30).

## I.      Factual Background

The following facts are taken from the defendants' joint statement of undisputed facts unless otherwise indicated (Dkt. No. 28). Separate defendant Mr. Owens served as Mayor of Hughes, Arkansas, from January 1, 2011, until he left office on December 31, 2014. On October 30, 2013, separate defendant former Chief McCluskey was offered the position of Chief of Police by the City of Hughes, and he accepted the position on November 3, 2013.

Separate defendant Wright, Sr., attended the Arkansas Law Enforcement Training Academy ("ALETA") from January 5, 2014, to March 28, 2014, and while there, successfully completed the Basic Police Training Course consisting of 480 hours of law enforcement training (Dkt. No. 28, Ex. 18). Officer Wright, Sr., was awarded the technical certificate in Law Enforcement from Southern Arkansas University Tech on March 28, 2014 (*Id.*, Ex. 19). While at ALETA, Officer Wright Sr. received OC Spray (Oleoresin Capsicum Spray, also known as "pepper-spray") training, including the appropriate use of OC spray according to the Federal Law Enforcement Training Center Use of Force Model.

On April 22, 2014, separate defendant Officer Wright, Jr., was awarded a certificate of completion for the Part-Time II Course 2013-2522 by the Forrest City Police Department. The part-time II class was a general overlook of law enforcement that offered a certification and went over several points of law enforcement, including but not limited to traffic stops, how to approach a car, how to deal with certain people, hostile environments, use of force, weapons, how to handle a weapon, red flags, when people give you drugs, narcotics, and places where people can hide drugs in the car. Officer Wright, Jr., was also awarded a certificate of completion for successfully completing the "required course of study approved by C.L.E.S.T. for the State of Arkansas" with respect to the use of OC Spray and Use of Force (*Id.*, Ex. 16).

Officer Wright, Jr., was hired as a part-time patrolman for the City of Hughes on May 12, 2014, and assigned badge number 406. Former Chief McCluskey was the Chief of Police when Officer Wright, Jr., was hired. Prior to hiring Officer Wright, Jr., former Chief McCluskey contacted Officer Wright, Jr.'s previous employers, personal references, and business references listed on his application. Officer Wright, Jr., was offered in-house training while he was at the Hughes Police Department, including going through a Field Training Officer ("FTO") program with Lieutenant David Boykin, with whom Officer Wright, Jr., rode for about a week, and then Officer Wright, Jr., moved on to train with another officer, and this occurred two or three times.

When Officer Wright, Jr., first started with the Hughes Police Department, he could not ride alone by himself; he had to be trained as far as getting familiarized with the City, the areas and streets, the procedures, getting comfortable with telling people what to do, and pulling people over. After completing the FTO ride-along program, Officer Wright, Jr., was not allowed to be on a shift by himself until former Chief McCluskey spoke to Lieutenant Boykin and the other officers

who trained him, and they were all in agreement that he was ready to be on a shift or to cover a shift by himself.

Former Chief McCluskey resigned as the Hughes Chief of Police, effective May 29, 2014. On June 2, 2014, Kristy Green was offered the position of interim Police Chief for the City of Hughes, and she accepted. On August 27, 2014, Officer Wright, Sr., applied for employment with the Hughes Police Department and began working part-time for the Hughes Police Department shortly thereafter. The Chief of Police at the time Officer Wright, Sr., was hired was Chief Green.

At the time of his application, Officer Wright, Sr., was working full-time for the Forrest City Police Department ("FCPD") and had worked for the FCPD since August 2013. At the time Officer Wright, Sr., was hired, Interim Assistant Chief Richard Haggans told Officer Wright, Sr., that the policies that he was following at Forrest City applied the same in Hughes.

On September 15, 2014, a Hughes Police Staff Meeting was conducted by Chief Green and the following topics, among others, were discussed: Chief's Green's date of leave, schedules, clocking in and out, working assigned shifts, making arrests, courtesy and respect, and interim chief/chain of command. Also at the September 15, 2014, meeting, Chief Green informed the officers present that she would be leaving for the Police Academy on Sunday, September 21, 2014. At the September meeting, Chief Green communicated to the officers present that the schedule would remain the same until December 12, 2014, that no changes would be made unless authorized by the Interim Chief, and that any officer clocking in and out without approval from a supervisor was to be disciplined and potentially subject to termination.

Chief Green also informed the officers that, if an officer should make an arrest, before the subject was placed in the unit, he or she should be read their *Miranda* Rights, handcuffed, searched, and placed in the vehicle with the seat belt in use. It was the policy of the Hughes Police

Department to seat belt people who were being transported. Officer Wright, Sr., and Officer Wright, Jr., were both present at the September 15, 2014, meeting. On October 26, 2014, Officer Wright, Jr., signed the Law Enforcement Code of Ethics, promising in part to "respect the Constitutional rights of all men to liberty, equality and justice." (*Id.*, Ex. 10).

On November 12, 2014, Ritchie Haggans, acting as Assistant Chief, notated that he had conducted a thorough background investigation on Officer Wright, Jr., and Officer Wright, Sr., and found no disqualifiers for employment for either. Mr. Haggans served as Interim Chief of Police for the Hughes Police Department from approximately September 21, 2014, until December 17, 2014, while Chief Green was away at the Police Academy.

Mr. Glasper was in Hughes, Arkansas, on November 22, 2014, for his nephew's funeral and the repast at his sister Versie Pollard's house following the funeral. The funeral started at noon at the church, finished around 2:00 p.m., and the deceased was buried, after which people went back to Hughes and gathered at Ms. Pollard's house on College Street around 4:00 p.m. There were approximately 100 to 150 people at Ms. Pollard's three-bedroom house after the funeral, and most everyone was standing around. Everyone had been drinking alcohol and/or beer. Mr. Glasper drank what he referred to as "a couple of beers around 5:00 that evening and then drank some more, all together probably a 6 pack." (Dkt. No. 18, Ex. 1, Glasper Depo., 30:16-24, 31:1-14).

A physical fight broke out at Ms. Pollard's home between Mr. Glasper's niece, Rhonda Glasper, his nephew, Brian Glasper, his daughter, Angela Ross, and a "little cousin," whose name Mr. Glasper states he cannot remember. The police were called. On November 22, 2014, around 7:00 p.m., Officer Wright, Jr., was dispatched several times to College Street in reference to a female causing a disturbance. When Officer Wright, Jr., arrived the first time, the female who had

been causing problems, the cousin, had already left, so Officer Wright, Jr., left the scene. The police instructed Mr. Glasper's brother-in-law that, if the cousin came back, he should call the police again and that they would return.

On November 22, 2014, Officer Wright, Sr., arrived at work and was made aware that Officer Wright, Jr., had gotten a call to a scene prior to Officer Wright, Sr.'s arrival, but Officer Wright, Sr., was also made aware that the person suspected of causing a disturbance had left and that Officer Wright, Jr., had returned to the station.

At approximately 7:08 p.m., someone called 911 a second time complaining about the female returning and causing problems. Officer Wright, Jr., responded to the College Street location a second time. Officer Wright, Jr., arrived on the scene and observed the female subject being disorderly and disruptive. Officer Wright, Jr., believed that the family was having a gathering over a death in the family and because of that did not want to arrest anyone. He told the female subject to get in the car or she was going to go to jail. The car was parked on the side of the street across from Ms. Pollard's home.

Officer Wright, Sr., arrived on scene at the second call to the home, after hearing on the radio that Officer Wright, Jr., was going to need backup. When Officer Wright, Sr., arrived on the scene, he saw Officer Wright, Jr., telling a female to leave the area. The cousin opened the door to get out, and Mr. Glasper, who had been standing in the road, walked to the door of the car to tell her to get back in the car or she was going to go to jail.

Defendants contend that Officer Wright, Sr., noticed that a black male, Mr. Glasper, was leaning over Officer Wright, Jr.'s shoulder and was saying something. Officer Wright, Jr., turned around on his right side and told the man something, and then Officer Wright, Jr., turned back to talk to the female. Officer Wright, Jr., commanded Mr. Glasper to remove himself from the scene

because, at that time, he was obstructing government operations. Defendants contend that Officer Wright, Jr., told Mr. Glasper, "Sir, if you do not get back, I am going to pepper spray you." (Dkt. No. 38, Ex. 4, 39:6-8). Mr. Glasper disputes these facts (Dkt. No. 39, at 1).

Mr. Glasper, in his deposition testimony, maintains that all were standing on the road when Officer Wright, Jr., told Mr. Glasper's cousin to get in the car and leave or go to jail. Mr. Glasper contends that Officer Wright, Jr., then walked away, and his cousin started to get out of the car. Mr. Glasper testified that he approached the car, telling his cousin to get back in the car or go to jail. Mr. Glasper contends that, then, Officer Wright, Jr., told Mr. Glasper that if he did not get back he would be pepper sprayed. Mr. Glasper maintains that he threw up both of his hands and backed up to the end of the car, but he testified at his deposition that Officer Wright, Jr., ran into him from the front of the car, shoving his chest, and pushing the pepper spray (Dkt. No. 38, at 16-17).

All parties agree that Officer Wright, Jr., then pepper sprayed Mr. Glasper. Officer Wright, Sr., did not see Officer Wright, Jr., pepper spray Mr. Glasper. Officer Wright Jr. got pepper spray in his eyes when he sprayed Mr. Glasper.

Defendants state that Officer Wright, Jr., then put Mr. Glasper on the ground and handcuffed him. Mr. Glasper disputes that he was "put" on the ground (Dkt. No. 39, at 1). Mr. Glasper testified at his deposition that Officer Wright, Jr., grabbed him by the arm, swung him, and threw him on the ground on a pile of bricks (Dkt. No. 39, at 22-23). He maintains that Officer Wright, Jr., put his knee in his back and put the handcuffs on him (Dkt. No. 23-24).

All parties agree that, after Mr. Glasper was handcuffed, he was placed in the back seat of the patrol unit. Mr. Glasper was arrested for obstructing governmental operations and disorderly conduct. During the hand-cuffing, family members and other people from the crowd of 100 to 150

people were gathering around Officer Wright, Jr., and Mr. Glasper and yelling.  Officer Wright, Jr., did not restrain Mr. Glasper with a seatbelt in the patrol car.  Due to the hostile crowd, Officer Wright, Jr., contends that he decided to meet the other officer on duty, Officer Wright, Sr., at the station.

Defendants assert that, as Officer Wright, Jr., began to drive off with Mr. Glasper in the patrol car, people were touching the patrol car and pulling on the door of the car.  Officer Wright, Jr.'s car was shaking, and there was a large crowd around the patrol car using profanity and saying "he didn't do anything. . .let him out. . .let him out."  Mr. Glasper disputes that anyone in the crowd was pulling on the car door (*Id.*).  He claims, instead, that he heard the crowd talking and telling Officer Wright, Jr., to close the door when Officer Wright, Jr., threw him into the car (Dkt. No. 39, at 25).  Further, he testified at his deposition that Officer Wright, Jr., said, "F**king forget the door." (Dkt. No. 39, at 26).

Defendants maintain that Officer Wright, Jr., pulled off at normal speed, made a left turn, drove about a block, made a second left turn, looked back to check on Mr. Glasper, and noticed that Mr. Glasper was not in the car because the door had come open and Mr. Glasper had slid out of the car.  Mr. Glasper disputes defendants' assertion that he "slid" out of the car, but he provides no elaboration in his response to the defendants' statement of undisputed facts (*Id.*).  Mr. Glasper testified at his deposition the only thing he remembers is, when Officer Wright, Jr., left him and turned the car to the left or turned the corner, that is when he slid out of the car.  He maintains his hands were handcuffed behind his back, that he was lying on the seat, and that he could not sit up or brace himself (Dkt. No. 39, at 26).

All parties agree that Officer Wright, Jr., stopped the car, located Mr. Glasper in the grass, ran to him, removed his handcuffs, made sure he was not hurt, and then called for backup, extra

units, and emergency medical help. Officer Wright, Jr., removed the handcuffs from Mr. Glasper in case of possible injuries. At the time Officer Wright, Jr., arrived to Mr. Glasper, Officer Wright, Sr., came to his location. Officer Wright, Sr., did not see Mr. Glasper ejected from the vehicle. A large hostile crowd gathered at the location. At approximately 7:23 p.m., someone called 911 and stated that one of the Hughes cops had run over her uncle and that he was lying in the road. Mr. Glasper's family believed that he had been run over, but he had not been run over.

An ambulance took Mr. Glasper to the Hughes High School football field. On November 22, 2014, three troopers with the Arkansas State Police responded to the Hughes High School in reference to a possible riot associated with Mr. Glasper's arrest. The helicopter took Mr. Glasper from the football field to the Medical Center ("the Med"). Mr. Glasper was at the Med for approximately 12 hours.

On November 24, 2014, Assistant Chief Haggans notified Former Mayor Owens that "due to the incident on 11/22/2014 at approximately 7:30 p.m. Officer James J. Wright Jr. and Officer James L. Wright Sr. have been place[d] on administrative leave without pay until investigation is closed." On November 25, 2014, both Officer Wright, Jr., and Officer Wright, Sr., were placed on administrative leave without pay from the Hughes Police Department, effective November 22, 2014, until further notice. On December 27, 2014, Interim Chief Green wrote a memo to Officer Wright, Sr., communicating to him that his employment with the City of Hughes was being terminated, in part, because he had been clocked in and working on November 22, 2014, without having been previously authorized to do so by the City. On January 2, 2015, Interim Chief Green informed Officer Wright, Jr., and Officer Wright, Sr., that their respective employment with the City of Hughes had been terminated effective December 31, 2014.

Former Mayor Owens died on or about February 16, 2016. Mr. Glasper sued the late Mayor Owens because he knew Mayor Owens prior to the incident, and Mayor Owens did not call him or check up on him after the incident.

Mr. Glasper sued the City of Hughes because that is the entity that employed Officer Wright, Jr., and Officer Wright, Sr., when he was arrested on November 22, 2014. Prior to November 22, 2014, Mr. Glasper had never met Officer Wright, Jr., or Officer Wright, Sr., and Mr. Glasper does not know anything about them. Prior to November 22, 2014, Mr. Glasper had not had any interactions with law enforcement officers for the City of Hughes. Mr. Glasper has never heard anyone complain about Hughes Police Officers. Mr. Glasper had not seen either Officer Wright, Jr., or Officer Wright, Sr., since November 22, 2014, until their depositions in this matter.

Mr. Glasper has no first-hand knowledge about how the City of Hughes hires its police officers. Mr. Glasper has no knowledge about how the City of Hughes supervises its police officers. Mr. Glasper has no knowledge about how the City of Hughes trains its police officers. Mr. Glasper has no knowledge about the policies and procedures of the City of Hughes.

Mr. Glasper sued former Chief McCluskey because Mr. Glasper believed that former Chief McCluskey called to speak with him on or about November 24, 2014, but that former Chief McCluskey spoke to Mrs. Glasper instead. Mr. Glasper believed that Chief McCluskey told Mrs. Glasper that Mr. Glasper had been arrested but not read his rights. He asked her what happened, told her that someone said Mr. Glasper was not injured, and told her that he asked the hospital about Mr. Glasper's records, to which Mrs. Glasper responded that he could watch Channel 13 local news and speak to their attorney. The parties agree that Mr. Glasper is not actually certain who called him, other than that it was a man and that the man said he was from Hughes, Arkansas.

Former Chief McCluskey was not Chief of Police at the time of the incident. Former Chief McCluskey was not the Chief of Police when Officer Wright, Sr., was employed by the Hughes Police Department. Former Chief McCluskey has no personal knowledge regarding the incident involving Mr. Glasper and has never met Mr. Glasper. Former Chief McCluskey did not make a telephone call to Mrs. Glasper following the incident.

Neither the City of Hughes nor the Hughes Police Department have any written or unwritten policies, procedures, or customs condoning, promoting, or causing the violation of the rights of those who come into contact with Hughes Police Officers. Law enforcement officers for the City of Hughes, Arkansas, did not and do not have the authority to make final policies for the City of Hughes, Arkansas. When asked in written discovery to identify specifically how the City of Hughes violated his rights, Mr. Glasper simply reiterated his factual assertions regarding the events of November 22, 2014.

Defendants contend that the alleged injury to Mr. Glasper's shoulder occurred when he was somehow displaced from the patrol car and the injury did not occur when he was taken to the ground by Officer Wright, Jr. Mr. Glasper disputes this. Mr. Glasper testified that the left side of his face was sore, that he had a scar on his face, that he had a scar on his arm, and that he had a scar on the top of his head (Dkt. No. 39, at 31).

Defendants further contend that, on November 22, 2014, Officer Wright, Jr., arrested Mr. Glasper and placed him in the back of his patrol unit. When Officer Wright. Jr., left the scene of the arrest, he believed that the doors to the back of his patrol car were securely shut. Officer Wright, Jr., did not leave the back door to the patrol car ajar. There was a large, hostile crowd around Officer Wright, Jr., when he arrested Mr. Glasper. It is possible that a member of the crowd opened the door to the back of Officer Wright, Jr.'s patrol car after Officer Wright, Jr.,

placed Mr. Glasper in the back of the car. Officer Wright, Jr., did not intend to harm Mr. Glasper as Officer Wright, Jr., drove the patrol car away from the scene of his arrest. Mr. Glasper disputes these facts "to the extent the declaration of James Wright Jr. is self-serving and disputed Mr. Glasper's deposition testimony." (Dkt. No. 39, at 1-2).

Finally, it is undisputed that Mr. Glasper could not see when he was in the back of the patrol car due to pepper spray being in his eyes, and, therefore, he testified that he does not know if the crowd gathered around the patrol car and does not know if the door to the back of the patrol car was open or shut when Officer Wright, Jr., left the scene.

## II.    Standard of Review

Summary judgment is proper when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Holloway v. Lockhart*, 813 F.2d 874, 878 (8th Cir. 1987). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.    Analysis

Mr. Glasper alleges that his rights as secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States were violated, and he brings suit pursuant to 42 U.S.C. § 1983, as well as the ACRA.  Section 1983 creates a cause of action against a person acting "under color of any statute . . . of any State" who deprives another of a federally protected right.  *Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008) (quoting 42 U.S.C. § 1983).  To be liable under § 1983, the claimed deprivation must result from the exercise of a right or privilege having its source in state authority, and the party charged with the deprivation must be one appropriately characterized as a state actor.  *Id*. (quotations omitted).

In addition, "[t]he Arkansas Civil Rights Act prohibits persons, acting under color of state law, from depriving any person of 'any rights, privileges, or immunities secured by the Arkansas Constitution.'"  *Glenn v. Bachand*, No. 2:05-cv-00132-WRW, 2007 WL 865488, at *2 (E.D. Ark. March 20, 2007) (citing *West v. Atkins*, 487 U.S. 42 (1988).  The "ACRA expressly requires that courts look to federal civil rights law for guidance:  'When construing this section, a court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act of 1871.'"  *Glenn*, 2007 WL 865488, at *2.  The City defendants contend that, "[m]oreover, the Arkansas Supreme Court has stated that Article 2, § 15 of the Arkansas Constitution is "virtually identical to the Fourth Amendment" and will be interpreted "in the same manner as the United States Supreme Court interprets the Fourth Amendment."  *Rainey v. Hartness*, 5 S.W.3d 410, 415 (Ark. 1999).  Thus, the City defendants assert that the analysis of Mr. Glasper's federal constitutional claims under § 1983 is equally applicable to Mr. Glasper's state constitutional claims under the ACRA.  The Court agrees.

Mr. Glasper concedes his claims under the Fifth and Eighth Amendments; thus, the Court will analyze Mr. Glasper's federal constitutional claims only under the Fourth and Fourteenth Amendments.

### A.    Claims Against Officer Wright, Jr.

The Court notes that Officer Wright, Jr., has been sued in both his official and individual capacities under 42 U.S.C. § 1983. Official-capacity claims against government officials are the functional equivalent of claims against the municipal entity in question, which in this case is the City of Hughes. *See, e.g., Rogers v. City of Little Rock, Ark.,* 152 F.3d 790, 800 (8th Cir. 1998). The Court's analysis of Mr. Glasper's claims against the City of Hughes apply equally to his official-capacity claims against Officer Wright, Jr.

As to Mr. Glasper's individual-capacity claims, Officer Wright, Jr., asserts that he is entitled to qualified immunity on those claims (Dkt. No. 31, at 4). Qualified immunity shields government officials from liability in their individual capacity so long as the official has not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome the defense of qualified immunity, the plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right, and (2) the right was clearly established at the time of the deprivation. *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). District courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The City defendants, in their brief in support of their motion for summary judgment, note that "there are arguably material issues of fact that would preclude summary judgment as to the

claims against Wright Jr. personally." (Dkt. No. 29, at 2). Officers Wright, Jr., and Wright, Sr., disagree with that contention and believe that both officers are entitled to summary judgment in their individual capacities.

### 1. Allegations Of Unreasonable Seizure

At the outset, the Court acknowledges that Mr. Glasper's § 1983 claims in his operative complaint include an allegation that he was unlawfully detained (Dkt. No. 18, ¶ 1). The Court construes this as a claim that Mr. Glasper's seizure was unreasonable and thereby violated the Fourth Amendment. The status of this claim is unclear based on the filings of Officer Wright, Jr., and Mr. Glasper (Dkt. No. 37). Because it is unclear whether Mr. Glasper intends to persist with this claim, the Court will address it.

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .' This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8 (1968). "Probable cause to arrest exists when, at the moment the arrest was made. . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996). Police officers are entitled to "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Because the qualified

immunity privilege extends to a police officer who is wrong, so long as he is reasonable, "[t]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996).

For these reasons, the second prong of the qualified immunity analysis is not in dispute in this case. Only the first prong, whether the facts demonstrate the deprivation of a constitutional right when taken in the light most favorable to Mr. Glasper, is at issue.

This right is clearly established in Arkansas state law, as well. Arkansas Rule of Criminal Procedure 4.1(a)(iii) provides that a law enforcement officer may arrest an individual without a warrant if "the officer has reasonable cause to believe that such person has committed any violation of law in the officer's presence."

The fact that an arrest may be for a misdemeanor is immaterial to the Fourth Amendment analysis. *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000). Whether the person arrested is later found innocent also is not material to the analysis. *Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir. 1993). Further, the Supreme Court has determined that a seizure which violated police regulations limiting the authority of plainclothes officers in unmarked vehicles did not necessarily mean the seizure violated the Fourth Amendment. *Whren v. United States*, 517 U.S. 806 (1996). Likewise, that a warrantless arrest violates state law does not necessarily mean it violates the Fourth Amendment. In *Virginia v. Moore*, 553 U.S. 164, 168-69 (2008), the Supreme Court determined that officers did not violate the Fourth Amendment by arresting a motorist whom they had probable cause to believe had been driving with a suspended license, even though, as a matter of state law, the misdemeanor offense was one for which officers should have issued summons rather than made an arrest.

Officer Wright, Jr., claims that he arrested Mr. Glasper because Mr. Glasper disobeyed multiple commands to remove himself from the scene where Officer Wright, Jr., was conversing with a female suspect (Dkt. No. 44, at 9). Officer Wright, Jr., contends that he commanded Mr. Glasper to remove himself from the scene because, at that time, he was obstructing governmental operations (Dkt. No. 28, Ex. 4, Glasper Depo, 22:8-10). Officer Wright, Jr., asserts that he stated to Mr. Glasper, "Sir, if you do not get back, I am going to pepper spray you." (*Id.*, 39:6-8). Officer Wright, Jr., then pepper sprayed Mr. Glasper and arrested him for "obstructing government operation and disorderly conduct." (*Id.*, 30:3-4). Mr. Glasper was cited for disorderly conduct (Dkt. No. 28, Ex. 31). The crime of disorderly conduct is codified at Arkansas Code Annotated § 5-71-207 and provides, in pertinent part: "[a] person commits the offense of disorderly conduct if, and with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk thereof, he . . . obstructs vehicular or pedestrian traffic."

Mr. Glasper disputes Officer Wright, Jr.'s version of these events. Mr. Glasper, in his deposition testimony, maintains that all were standing on the road when Officer Wright, Jr., told Mr. Glasper's cousin to get in the car and leave or go to jail. Mr. Glasper contends that Officer Wright, Jr., then walked away, and his cousin started to get out of the car. Mr. Glasper claims that he approached the car, telling his cousin to get back in the car or go to jail. Mr. Glasper alleges that immediately upon being told by Officer Wright Jr. to "get back" that he "throwed up both my hands and backed up." (Dkt. No. 38, Ex.1, Glasper Depo., 36:3-4). Mr. Glasper further contends that, at that point, Officer Wright Jr. "ran in to me pushing the pepper spray," and that Officer Wright, Jr. forcefully "ran in to me, pushed me, and pepper sprayed me, he then throwed me on the ground." (*Id.*). Mr. Glasper testified in his deposition that he "never was close to [Officer Wright Jr.]" prior to being attacked and sprayed with the pepper spray and that he "ain't said nary

a word to nary one of 'em. I didn't use no cuss words or nothing." (Dkt. No. 39, Ex. A., Excerpt from Glasper Depo., 40: 11-23). Mr. Glasper contends that Officer Wright, Jr., next grabbed him by the arm, swung him, and threw him on the ground on a pile of bricks (Dkt. No. 39, at 22-23). He maintains that Officer Wright, Jr., put his knee in his back and put the handcuffs on him (Dkt. No. 23-24).

There are disputed issues of fact that preclude this Court from granting qualified immunity to Officer Wright, Jr., in his individual capacity on Mr. Glasper's unreasonable seizure claim.

### 2. Allegations Of Excessive Force

Mr. Glasper's § 1983 claims against Officer Wright, Jr., include an excessive force claim. The Fourth Amendment's objective reasonableness standard is used to analyze all claims that a law enforcement officer has used excessive force, whether deadly or not, in the course of an arrest, investigatory stop, or other seizure. *Nance v. Sammis*, 586 F.3d 604, 609-10 (8th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The key question is whether the officer's actions are objectively reasonable in the light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent or motivation. *Id.* The reasonableness of an officer's use of force is evaluated by looking at the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).

It is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public. *Id.* (citing *Graham,* 490 U.S. at 396; *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007); *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002); *Henderson v. Munn*, 439

F.3d 497, 503 (8th Cir. 2006)).  This Court concludes it also is clearly established that a threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee.  *See, e.g., Lawyer v. City of Council Bluffs,* 361 F.3d 1099 (8th Cir. 2004).

The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures.  *Coker v. Arkansas State Police*, 734 F.3d 838, 842 (8th Cir. 2013).  Thus, the second prong of the qualified immunity analysis is not in dispute here.  The Court will confine its analysis to the first prong— whether the facts demonstrate the deprivation of a constitutional right when taken in the light most favorable to Mr. Glasper.

At the summary judgment stage, the Court must resolve all factual disputes in favor of the non-moving party.  Therefore, at this stage of the litigation the Court must resolve all reasonable inferences in favor of Mr. Glasper.  Taking the facts in the light most favorable to Mr. Glasper, Officer Wright, Jr., arrived on scene at Ms. Pollard's home and observed the female subject being disorderly and disruptive.  Officer Wright, Jr., believed that the family was having a gathering over a death in the family.  Because of that, he did not want to arrest anyone, so he told the cousin to get in the car or she was going to go to jail.  The car was parked on the side of the street across from Ms. Pollard's home.  Officer Wright, Sr., arrived on the scene at the second call to the home after hearing on the radio that Officer Wright, Jr., was going to need backup.  When Officer Wright, Sr., arrived on the scene, he saw Officer Wright, Jr., telling a female suspect to leave the area.  The cousin opened the door of the car to get out of the vehicle, and Mr. Glasper, who had been standing in the road, walked to the door of the car to tell her to get back in the car or she was going to go to jail.

Defendants contend that Officer Wright, Sr., noticed that a black male, Mr. Glasper, was leaning over Officer Wright, Jr.'s shoulder and was saying something, and Officer Wright, Jr., turned around on his right side, told the man something, and turned back to talking to the female. Officer Wright, Jr., contends that he commanded Mr. Glasper to remove himself from the scene because at that time he was obstructing government operations. Defendants assert that Officer Wright, Jr., told Mr. Glasper, "Sir, if you do not get back, I am going to pepper spray you." (Dkt. No. 38, Ex. 4, 39:6-8). Officer Wright, Jr., then pepper sprayed Mr. Glasper.

Officer Wright, Sr., did not see Officer Wright, Jr., pepper spray Mr. Glasper. Officer Wright, Jr., got pepper spray in his eyes when he sprayed Mr. Glasper. Defendants maintain that Officer Wright, Jr., then put Mr. Glasper on the ground and handcuffed him. Mr. Glasper disputes that he was "put" on the ground and argues that he was violently thrown (Dkt. No. 39, at 1). As detailed above, Mr. Glasper disputes Officer Wright, Jr.'s version of the events leading up to his being pepper sprayed and handcuffed. After Mr. Glasper was handcuffed, he was placed in the back seat of the patrol unit.

Whether or not Officer Wright, Jr., felt threatened is a factor that this Court must analyze when examining the alleged use of force. In this case, Officer Wright, Jr., and Officer Wright, Sr., both testified that there was an angry mob around them yelling at the scene. Mr. Glasper admits that he could not see once he was pepper sprayed and is unsure about whether people were surrounding the area. The Court acknowledges that the parties dispute whether Officer Wright, Jr., felt threatened.

When resolving a motion for summary judgment based on qualified immunity, the key question is whether the officer's actions are objectively reasonable in the light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent or

motivation. *Nance,* 586 F.3d at 609-10. Therefore, a factual dispute about whether Officer Wright, Jr., subjectively felt threatened does not dictate the outcome of a summary judgment motion alleging qualified immunity. Defendants claim that, because there were 100 to 150 angry individuals surrounding him as he was talking to the female suspect, and because Mr. Glasper was over Officer Wright, Jr.'s right shoulder, the side on which Officer Wright, Jr., carries his weapon, Officer Wright, Jr., felt a sense of hostility (Dkt. No. 28, Ex. 4, Wright Jr. Depo., 22: 18-20; 23:1). Mr. Glasper maintains that, at the time he was pepper sprayed, he was not near Officer Wright, Jr., was not being combative, and was obeying Officer Wright, Jr.'s commands (Dkt. No. 28, Ex. 1, Glasper Depo., 39:5-11 ("She opened the door. I said, cousin, get back in the car or you're going to go to jail. And she put her foot back and I closed the door. He told me, he said, sir, if you don't get back, I'm going to pepper spray you. I backed up with both my hands up in the air. And that's when he ran into me, pushed me, and pepper sprayed me. He then throwed me on the ground."); Glasper Depo., 40:10-15 ("I never was. I never was close to him. . . . I didn't say nothing to 'em. I didn't cuss nary a time. When he told me to get back I throwed up both my hands and backed up."); Glasper Dep., 41:1-8 ("One time. That was when he was standing in front of the car. That was when he was standing in front of the car he – when he told me if I didn't get out of the way he's going to pepper spray, and I backed up. . . . I done backed up back by the car. I done backed all the way back to the back end of the car.")).

The severity of the crime at issue is a factor this Court also must consider in determining whether Officer Wright, Jr.'s use of force was objectively reasonable as a matter of law. *See Howard,* 570 F.3d at 989 (citations omitted). The charges for which Mr. Glasper was arrested are nonviolent crimes, and the record evidence does not indicate the crimes were severe or violent. However, a threat to an officer's safety can justify the use of force in cases involving relatively

minor crimes and suspects who are not actively resisting arrest or attempting to flee. *See, e.g.,*
*Lawyer,* 361 F.3d at 1099. Here, Officer Wright, Jr., did not face the same type of immediate
threat as the threat in *Lawyer* and was not engaged in a struggle with an individual actively resisting
arrest when pepper spray was used. In addition, Officer Wright, Sr., may also have been present
as well.

Another factor this Court must take into account in determining the reasonableness of an
officer's use of force is the result of the force, that is, the injuries sustained by the person to whom
force was applied. *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) ("In addition to the
circumstances surrounding the use of force, we may also consider the result of the force.") (quoting
*Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003)) (citing *Patzner v. Burkett*,
779 F.2d 1363, 1371 (8th Cir. 1985) (stating that, in considering the reasonableness of force used,
the extent of any resulting injuries is relevant)).

Here, the record is unclear regarding what injuries Mr. Glasper suffered as a result of being
pepper sprayed, especially when compared to the injuries he claims he suffered after sliding out of
the patrol car.

The Court cannot conclude, based on the record evidence taken in a light most favorable
to Mr. Glasper, that Officer Wright, Jr.'s conduct was objectively reasonable under the
circumstances. There are genuine issues of material fact in dispute that must be resolved by a jury.
Therefore, this Court declines to find that, as a matter of law, Officer Wright, Jr., is entitled to
qualified immunity in his individual capacity.

### 3. Fourteenth Amendment Claim

Mr. Glasper asserts that Officer Wright, Jr., was deliberately indifferent to Mr. Glasper's
right to be free from cruel and unusual punishment under the Eighth Amendment as well as his

right to due process under the Fourteenth Amendment (Dkt. No. 18, ¶¶ 24). The Court notes that, because Mr. Glasper was a pretrial detainee when the underlying events occurred, Mr. Glasper's claims against Officer Wright, Jr., are "not analyzed under the Eighth Amendment, but instead under the Fourteenth Amendment's Due Process Clause." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). This fact makes little practical difference, as "[p]retrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Id.*

The factual basis of Mr. Glasper's constitutional claims under the Fourteenth Amendment is that Officer Wright, Jr., was allegedly deliberately indifferent to Mr. Glasper's constitutional rights by failing to buckle properly Mr. Glasper's seatbelt in the back of the patrol car and as a result of the door to the patrol car either not being closed before pulling away or opening en route. The Court construes Mr. Glasper's claim regarding his ejection from the patrol vehicle as a failure to protect claim.

To recover on his failure to protect claim, Mr. Glasper must establish two things. First, he "must prove [that he] was '[detained] under conditions posing a substantial risk of serious harm.'" *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "This is an objective requirement to ensure the deprivation is a violation of a constitutional right." *Id.* (citing *Jensen v. Clarke,* 94 F.3d 1191, 1197 (8th Cir.1996)). Next, he "must establish [that Officer Wright, Jr.,] was deliberately indifferent to [Mr. Glasper's] health or safety." *Id.* (citing *Farmer,* 511 U.S. at 834). The second requirement is subjective, meaning Mr. Glasper must prove that Officer Wright, Jr., "both knew of and disregarded 'an excessive risk to [Mr. Glasper's] health or safety.'" *Id.* (quoting *Farmer,* 511 U.S. at 837). "Deliberate indifference requires 'more than mere negligence,' but does not require acting 'for the very

purpose of causing harm or with knowledge that harm will result.'"  *Brown,* 518 F.3d at 558 (quoting *Farmer*, 511 U.S. at 835).

As to the first prong, the Eighth Circuit Court of Appeals has analyzed what types of situations constitute a substantial risk to a pre-trial detainee.  The Eighth Circuit "has previously held that failure to provide a seatbelt to a prisoner while driving in a manner that puts the prisoner at risk of injury can constitute deliberate indifference to a prisoner's safety and health." *Brown*, 518 F.3d at 558 (citing *Brown v. Morgan,* 39 F.3d 1184 (8th Cir. 1994) (per curiam) (stating that "[w]hile a constitutional claim cannot be based on mere negligence. . . when prison officials intentionally place prisoners in dangerous situations or manifest deliberate indifference for their safety, the Eighth Amendment is violated")).  In *Fortner*, an inmate filed a § 1983 action against two correction officers, Fortner and Scott, involved in inmate transportation.  The inmate alleged that he sustained injuries when the officer operated the transport vans recklessly and refused to buckle inmates' seat belts while knowing the inmates could not buckle themselves due to shackles and restraints.  *Fortner*, 518 F.3d at 559-60.  The Eighth Circuit Court of Appeals affirmed the district court's order denying qualified immunity to Fortner but reversed to grant qualified immunity to Scott.  *Id.* at 560-62.    The Eighth Circuit held that the plaintiff had presented sufficient evidence against Fortner that there may have been an Eighth Amendment violation when Fortner knew the plaintiff was shackled and restrained in a manner that prevented him from securing his own seatbelt, rejected plaintiff's request for a seatbelt, drove in excess of the speed limit, followed too closely behind a lead van, crossed over double-yellow lines, made prohibited passes, and ignored inmates' requests to slow down.  *Id.* at 559.  The court concluded that Fortner's actions created a substantial risk of harm and that Fortner "knew of and disregarded the risk he created." *Id.* at 559-60.  The Eighth Circuit concluded that, although Scott also may have driven

in a reckless manner, Scott did not refuse a request to slow down, and there was no evidence that Scott knew the inmates were not in seat belts or that the inmates were concerned for their safety. *Id.*

In *Morgan*, the plaintiff filed a § 1983 action alleging that he was involved in an accident while a passenger in a car driven by a Pulaski County Sheriff's Deputy. *Morgan*, 39 F.3d at 1184. The plaintiff alleged that the deputy "manifested deliberate indifference for his safety by refusing to let him wear a seat belt, driving at a high rate of speed in bad weather, refusing to slow down despite [the plaintiff's] pleas for him to do so, purposely speeding up, and smiling when he saw that [the plaintiff] was scared, asking, 'Are you scared?'" *Id.* The Eighth Circuit Court of Appeals reversed the district court's grant of qualified immunity, concluding that the facts alleged in the complaint were "sufficient to support a conclusion that [the Deputy] manifested deliberate indifference for [the plaintiff's] safety, and thus entitle [the plaintiff] to relief." *Id.*

However, in *Spencer v. Knapheide Truck Equipment, Co.*, a pretrial detainee was injured when, while handcuffed behind his back and being transported by police in a patrol car not equipped with safety restraints, he was thrown forward into the bulkhead of the car causing severe injuries and rendering him quadriplegic. 183 F.3d 902, 904 (8th Cir. 1999). The plaintiff sued members of the Board of Police Commissioners of Kansas City, Missouri. The district court granted qualified immunity to the Board members using the deliberate indifference standard, and the Eighth Circuit Court of Appeals affirmed. *Id.* The Eighth Circuit determined that "the Board's purchase of patrol wagons without safety restraints nor its manner of transporting individuals in these wagons were policies that obviously presented a substantial risk of serious harm." *Id.* at 906. Further, the court found that, although the Board was aware of previous complaints of injuries

sustained during transport, "the complaints d[id] not establish that the Board was deliberately indifferent to conditions that posed a substantial risk of serious harm." *Id.*

The aforementioned Eighth Circuit cases involved the combination of reckless driving and a detainee who was not placed in a seat belt. If the reckless driving component is missing, the Eighth Circuit has held that the mere failure to restrain a passenger in a police vehicle does not violate the Constitution. *Spencer,* 183 F.3d at 902. Against this legal backdrop, to determine whether a constitutional violation exists here, the Court must know whether there existed a "substantial risk of harm to the inmate that [Officer Wright, Jr.,] knew of and disregarded." *Brown*, 518 F.3d at 552, 558.

Officer Wright, Jr., asserts that "[t]he uncontroverted evidence reveals that the injury to the plaintiff from falling or being thrown from the vehicle was accidental and, therefore, does not fall within the purview of § 1983. Consequently, that claim of the plaintiff should be dismissed." (Dkt. No. 31, at 2). At this stage, the Court must view the record evidence in a light most favorable to Mr. Glasper. Mr. Glasper argues that "failure to seatbelt Plaintiff in was likewise an intentional act on the part of James Wright, Jr. as he planned for Plaintiff to be thrown around in the vehicle on the ride to the station, as evidenced by his statement to the bystanders 'F… the door.' as well as his speed when leaving the scene. . . Certainly the deposition testimony herein created an issue of fact [for] a jury to determine whether or not James Wright, Jr.'s actions were intentional on the night in question and whether those intentional acts caused Plaintiff injury and/or harm." (Dkt. No. 38-1, at 2).

Although Mr. Glasper repeatedly alleges it in his filings, there is no record evidence to support and Mr. Glasper does not testify during his deposition that Officer Wright, Jr., was driving too quickly. In Mr. Glasper's deposition, he testified that Officer Wright, Jr., took two left turns

before Mr. Glasper fell out of the vehicle (Dkt. No. 28. Ex.1, Glasper Depo., 45:25, 46:1-2).  Mr. Glasper also stated that Officer Wright, Jr., had only driven about a block from the house where the altercation took place (*Id.*, 46:5-7).  Even construing the record evidence and all reasonable inferences in favor of Mr. Glasper, the Court cannot conclude that Officer Wright, Jr., was speeding.

In regard to whether Officer Wright, Jr., was driving recklessly, there is a disputed issue of material fact that impacts this analysis regarding the door to the patrol car.  It is undisputed that Mr. Glasper could not see when he was in the back of the patrol car due to pepper spray in his eyes.  Defendants assert that, as Officer Wright, Jr., began to drive off with Mr. Glasper in the patrol car, people were touching the patrol car and pulling on the door of the car.  According to defendants, Officer Wright, Jr.'s car was shaking, and there was a large crowd around the patrol car using profanity and saying "he didn't do anything. . .let him out. . .let him out." (Dkt. No. 28, at 9, ¶ 59).  Defendants suggest that a member of the crowd might have opened the door.

Mr. Glasper disputes that anyone in the crowd was pulling on the car door.  He claims, instead, that he heard the crowd talking and telling Officer Wright, Jr., to close the door when Officer Wright, Jr., threw him into the car (Dkt. No. 28, Ex. 1, Glasper Depo., 44:10-25; Dkt. No. 39, at 25).  Further, he testified at his deposition that Officer Wright, Jr., said, "'F**k' word forget the door.  He said that word." (Dkt. No. 28, Ex. 1, Glasper Depo., 45:1-2; Dkt. No. 39, at 26).

Based on the record evidence currently before the Court and drawing all reasonable inferences in favor of Mr. Glasper, the Court cannot conclude that as a matter of law no reasonable juror could believe that Officer Wright, Jr., placed Mr. Glasper in a situation that created a substantial risk of harm.  There are disputed issues of material fact that a jury must resolve.  For

this reason, this Court will not grant qualified immunity to Officer Wright, Jr., on Mr. Glasper's Fourteenth Amendment claim.

### 4. Pendent State Law Tort Claims

Mr. Glasper has brought several state law tort claims against Officer Wright, Jr., including assault, battery, intentional infliction of emotional distress, negligence, gross negligence, false arrest, false imprisonment, abuse of process, and conspiracy[4] (Dkt. No. 18, ¶ 27). These claims are brought against Officer Wright, Jr., in his individual capacity.

The only mention as to any state law tort claims that Officer Wright, Jr., makes in his motion for summary judgment consists of one paragraph: "Ark. Code Ann. § 21-9-301 provides for immunity of city employees for unintentional torts. That statute, however, does not provide for immunity for intentional torts, such as assault and battery. *See Battle v. Harris*, 298 Ark. 241, 766 S.W.2d 431 (1989). As discussed above, there is no evidence that [Officer] Wright, Jr., intended to harm the plaintiff when he fell out of the back of his patrol car." (Dkt. No. 31, at 3). Officer Wright, Jr., argues that, "[c]onsequently, the assault and battery claims associated with that injury should be dismissed." (*Id.*). Based upon his motion for summary judgment, the Court understands Officer Wright, Jr., to be moving for summary judgment only as to the assault and battery claims, not any of the other state law tort claims Mr. Glasper alleges against him. As a result, the Court will examine only the assault and battery claim, not any of the other state law tort claims Mr. Glasper alleges.

Officer Wright, Jr., correctly cites the law. Arkansas Code Annotated § 21-9-301 provides for immunity of city employees for unintentional torts. That statute does not provide for immunity

---

[4] In addition to these specific torts, Mr. Glasper also alleges in his amended complaint "other state law torts" and "prima facie tort." Mr. Glasper has not specifically identified these claims. Therefore, the Court declines to address these unspecified claims at this stage of the litigation.

for intentional torts, such as assault and battery. *See Battle*, 766 S.W.2d at 431. Because there are disputed issues of material fact that impact the analysis of whether Officer Wright, Jr., engaged in unintentional or intentional acts in regard to Mr. Glasper, the Court declines to grant Officer Wright, Jr., summary judgment on Mr. Glasper's assault and battery claims.

### B. Allegations Against Officer Wright, Sr.

As far as the Court can ascertain, Mr. Glasper's claims against Officer Wright, Sr., in his operative amended complaint are that Officer Wright, Sr., "knew of defendant Wright Jr.'s actions" and was "complicit" in his actions and additionally "participated in the conspiracy to cover up the misconduct and brutality of [Officer Wright, Jr.]." (Dkt. No. 18, ¶ 17). To the extent that Mr. Glasper has pleaded allegations of excessive force and failure to protect as to Officer Wright, Sr., the Court finds that Mr. Glasper has provided no record evidence to support his claims that Officer Wright, Sr., violated Mr. Glasper's constitutional rights under either the Fourth or Fourteenth Amendment as a result of actions he took directly. Officer Wright, Sr., was not involved in using pepper spray against Mr. Glasper, placing Mr. Glasper into handcuffs, placing Mr. Glasper into the patrol unit, not placing Mr. Glasper in a seat belt in the car, or purportedly not closing the car door properly.

To the extent Mr. Glasper intends to claim that Officer Wright, Sr., had a duty to supervise Officer Wright, Jr., there is no evidence in the record from which an inference could be drawn that Officer Wright, Sr., was a supervisor or held a position of authority over Officer Wright, Jr., at the Hughes Police Department. Further, even if such a relationship existed, Officer Wright, Sr., cannot be liable for any actions based on a theory of *respondeat superior. Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011). To the extent Mr. Glasper suggests Officer Wright, Sr., should be held liable under § 1983 based on a theory of failure to train or supervise adequately, this Court's

analysis of the claims against the City of Hughes applies equally to any such claim against Officer Wright, Sr.

This Court acknowledges that the law is clearly established in the Eighth Circuit that "[a] law enforcement officer who knows another officer is using excessive force has a duty to intervene." *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012) (citing *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981)). However, the record evidence does not support Mr. Glasper's claim that Officer Wright, Sr., knew that Officer Wright, Jr., purportedly was using excessive force during this incident. Officer Wright, Sr., testified in his deposition that he saw neither Mr. Glasper being pepper sprayed nor falling out of the patrol car (Dkt. No. 28, Ex. 3, Wright Sr. Depo., 32: 7-9). Mr. Glasper presents no record evidence to refute this testimony. As a result, even viewing the facts in the light most favorable to Mr. Glasper, the Court grants Officer Wright, Sr., summary judgment on Mr. Glasper's claim that Officer Wright, Sr., had a duty to intervene based on his alleged knowledge of Officer Wright, Jr.'s claimed use of excessive force.

As of 2013, however, the Eighth Circuit Court of Appeals had not recognized a duty to intervene to prevent other constitutional violations. *Hess v. Ables*, 714 F.3d 1048, 1052-53 (8th Cir. 2013); *Livers*, 700 F.3d at 360. Further, as of 2012, the Eighth Circuit acknowledged that the circuits were split at that time on whether a clearly established duty to intervene to stop other constitutional violations existed. *Id.* (citing cases). "[T]he right allegedly violated must be defined at the appropriate level of specificity." *Howard*, 570 F.3d at 991 (quoting *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008)). While "officials can still be on notice that their conduct violates established law even in novel factual circumstances," prior cases must give officers "fair warning that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). To the extent Mr. Glasper intends to claim that Officer Wright, Sr., had a duty to intervene to prevent

some other constitutional violation outside of the excessive force context, it was not clearly established at the time of the incident that such an action was unconstitutional, and therefore, Officer Wright, Sr., is entitled to qualified immunity on any such claim.

Mr. Glasper includes a common law conspiracy claim against only Officer Wright, Jr., in his amended complaint, not Officer Wright, Sr. (Dkt. No. 18, at 9). In his response to the pending motion for summary judgment and even in the alleged facts in his amended complaint, Mr. Glasper contends that Officer Wright, Sr., "participated in the conspiracy to cover up the misconduct and brutality of [Officer Wright, Jr.]." (Dkt. No. 18, ¶ 17). The Court acknowledges that "[i]t was clearly established by 2006 that the Fourteenth Amendment's guarantee of due process is violated by 'the manufacture of. . . false evidence' in order 'to falsely formulate a pretense of probable cause.'" *Livers*, 700 F.3d at 354 (citing cases). Further, "[i]ntentionally or recklessly failing to investigate other leads or manufacturing false evidence may shock the conscience and can violate the Fourteenth Amendment's due process clause." *Id.*, at 351 (citing cases).

To the extent this is the type of claim Mr. Glasper intended, the record evidence from Mr. Glasper's deposition is this:

> Q. Okay, tell me what happened when you – when you fell out the car.
>
> A. I couldn't see nothing. I heard everybody. I'll tell you what I heard. When I got in the car first thing I heard is help me get the handcuff off of him before they get down here. It – they was saying help me get the handcuff off him before the peoples get down here. They going to try to make a scene like I jumped out the car.
>
> Q. Okay, who said –
>
> A. But when – but when my folks got there and when they all got there they thought they had done run over me.
>
> Q. Un-huh.
>
> A. I still had one hand, they done took one of my – they done took this hand out the handcuff, and I still had the other on my arm.

. . .

Q.  Okay, so the car didn't actually run over you, is that correct?

A.  Ain't no car ran over me.

Q.  Okay, so how – well, after you fell out of the car did you have any further conversations with either of the police officers, the Hughes' police officers, my clients?

A.  I ain't said nothing to 'em.

Q.  Did they say anything to you?

A.  They didn't say nothing to me.

(Dkt. No. 39, at 27-28).

However, in their summary judgment papers, all defendants maintain, and Mr. Glasper does not dispute, that Officer Wright, Jr., stopped the car, located Mr. Glasper in the grass, ran to him, removed his handcuffs, made sure he was not hurt, and then called for backup, extra units, and emergency medical help (Dkt. Nos. 28, ¶¶ 61-65; 39).  All defendants maintain, and Mr. Glasper does not dispute, that Officer Wright, Jr., removed the handcuffs from Mr. Glasper in case of possible injuries (*Id.*).  All defendants maintain, and Mr. Glasper does not dispute, that, at the time Officer Wright, Jr., arrived to Mr. Glasper, Officer Wright, Sr., came to his location and that Officer Wright, Sr., did not see Mr. Glasper ejected from the vehicle (*Id.*).  Further, all defendants maintain, and Mr. Glasper does not dispute, that a large hostile crowd gathered at the location.  At approximately 7:23 p.m., someone called 911 and stated that one of the Hughes cops had run over her uncle and that he was lying in the road (*Id.*).  Mr. Glasper's family believed that he had been run over, but he had not been run over (*Id.*).

When taken together, the record evidence and all reasonable inferences drawn from it do not establish that Officer Wright, Sr., was involved in any type of conspiracy, including but not

limited to a conspiracy intended to cover up the claimed misconduct and brutality of Officer Wright, Jr., as Mr. Glasper alleges. The Court grants summary judgment to Officer Wright, Sr., on this claim.

### C. Mayor Owens

Mr. Glasper has sued Mayor Owens in both his individual and official capacity (Dkt. No. 18, at ¶ 8). The Court declines to analyze substantively Mr. Glasper's claim against Mayor Owens, as Mayor Owens is now deceased and therefore not a proper party in this action. Mayor Owens died on or about February 16, 2016. A suggestion of death was filed on February 22, 2016, notifying all parties of his passing (Dkt. No. 14).

With respect to the claims against Mayor Owens in his official capacity, in addition to being a legal redundancy to those claims filed against the City of Hughes as previously explained, upon his passing, his successor is automatically substituted as a party, thus, "Lawrence Owens in his official capacity" is a legal nullity. Fed. R. Civ. P. 25(d).

Federal Rule of Civil Procedure 25 states in relevant part that, "if a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1). The 90-day mark was May 22, 2016, which came and has long since passed without Mr. Glasper moving to substitute a successor or representative on behalf of the deceased Mayor Owens. Thus, Mr. Glasper's claims against Mayor Owens individually "must be dismissed." *Id.*

Even if the claims against Mayor Owens in his individual capacity were not required procedurally to be dismissed, the Court would dismiss such claims. "Each government official,

his or her title notwithstanding, is only liable for his or her own misconduct." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). There is no record evidence that Mayor Owens was involved in the events of November 22, 2014. To the extent Mr. Glasper named Mayor Owens as a defendant because he knew Mayor Owens prior to the date of his arrest and thought it was wrong that Mayor Owens did not call him or check up on him after the November 22, 2014, incident (Dkt. No. 28, ¶ 85), those allegations, even if true, fail to state a claim against Mayor Owens upon which relief can be granted.

In his amended complaint, Mr. Glasper alleges that Mayor Owens continued to employ Officers Wright, Jr., and Wright, Sr., after these events when Mr. Glasper contends he should have known that Officers Wright, Jr., and Wright, Sr., were deliberately indifferent to the rights of the citizens of Hughes generally and Mr. Glasper's rights specifically (Dkt. No. 18, ¶ 8). There is no record evidence that Mayor Owens employed Officers Wright, Jr., or Wright, Sr. The City of Hughes employed the officers, and the City of Hughes is a named defendant in this matter. Because the City of Hughes is a named defendant, any claims against Mayor Owens in his official capacity are a legal redundancy. Claims against individuals in their official capacities are equivalent to claims against the entity that they work for or represent. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

For all of these reasons, this Court grants summary judgment to Mayor Owens in his individual capacity.

### D.       Former Chief McCluskey

Mr. Glasper asserts official-capacity claims against former Chief McCluskey. Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell*,

436 U.S. at 690, n. 55). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Id.* Thus, this Court treats Mr. Glasper's official-capacity claims against former Chief McCluskey as a suit against the City, and the following analysis of Mr. Glasper's claims against the City applies equally to these official-capacity claims.

As for Mr. Glasper's claims against Chief McCluskey in his individual capacity, Mr. Glasper testified at his deposition that he sued Chief McCluskey because Mr. Glasper believed that Chief McCluskey called to speak with him but instead spoke with Mrs. Glasper on or about November 24, 2014 (Dkt. No. 28, ¶ 86). However, the record evidence is that Mr. Glasper is not certain who called him, other than that the caller was a man who said he was from Hughes, Arkansas (Dkt. No. 28, ¶ 87). Further, former Chief McCluskey was not the chief at the time of Mr. Glasper's arrest, and the record evidence is that he has no personal knowledge of this incident, has never met Mr. Glasper, and did not make a telephone call to Mrs. Glasper following this incident (Dkt. No. 28, ¶¶ 88, 90, 91). To the extent Mr. Glasper bases his claims against Chief McCluskey in his individual capacity on this telephone call, the Court grants summary judgment to Chief McCluskey because these allegations, which are not supported and in fact are contradicted by the record evidence, fail to state a claim upon which relief can be granted.

To the extent Mr. Glasper alleges deficient hiring and failure to train and supervise claims against former Chief McCluskey in his individual capacity, the facts and arguments pertaining to any alleged deficient hiring and failure to train and supervise claims against the City of Hughes apply equally to former Chief McCluskey. Further, Mr. Glasper's claims against former Chief McCluskey with respect to Officer Wright, Sr., fail because former Chief McCluskey was not chief at any point in time during Officer Wright, Sr.'s brief tenure with the Hughes Police Department.

Former Chief McCluskey was Chief of Police for the Hughes Police Department from November 3, 2013, until he resigned on May 29, 2014 (Dkt. No. 28, ¶¶ 2, 15).  Officer Wright, Sr., did not begin his employment with the City until around August 27, 2014 (*Id.*, ¶ 17).  City defendants argue that, "given that their respective employments with the City in no way overlap, former Chief McCluskey can in no way be held responsible or liable for any alleged failure to train or supervise Wright Sr." (Dkt. No. 29, at 23).  The Court agrees.

In addition, former Chief McCluskey and Officer Wright, Jr.'s employment with the City overlapped for approximately 17 days.  Based on the Court's analysis below related to claims against the City of Hughes, the Court finds no record evidence to support a deficient hiring or failure to train and supervise claim.  Even if such a claim existed, however, it cannot be said that in that short period of time of 17 days, Chief McCluskey hired inappropriately or failed to train or supervise appropriately Officer Wright, Jr., such that approximately six months later, Officer Wright, Jr., violated Mr. Glasper's rights.  This is particularly true given that Chief McCluskey was not chief at the time of Mr. Glasper's arrest on November 22, 2014, and had not been chief for approximately six months as of the time of his arrest (*Id.*, ¶¶ 15, 16, 29, 72).  For these reasons, the Court grants qualified immunity to former Chief McCluskey in his individual capacity for any deficient hiring and failure to train and supervise claims.

### E.  The City of Hughes

The City defendants also move for summary judgment as to all of the claims against the City, former Chief McCluskey in his official capacity, and the late Mayor Owens in his official capacity.  The City defendants assert that they are "entitled to summary judgment because no custom, policy, or practice led to a violation of Mr. Glasper's rights and the acts complained of by

Mr. Glasper were not a result of former Chief McCluskey's failure to train or supervise." (Dkt. No. 29, at 3).

For his claims against the individual defendants in their official capacity and the City of Hughes, Mr. Glasper must establish that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted . . . or pursuant to governmental 'custom.'" *Monell*, 436 U.S. at 690. Mr. Glasper contends that "[t]his case centers around a small town Arkansas police department's custom, practice and policy of hiring part-time police officers who are not fully trained as law enforcement officers." (Dkt. No. 36, at 3).

### 1.        Alleged Lack of Written Policies

Generally, a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation. *Graham*, 473 U.S. at 166 (internal quotations and citations omitted). Thus, the entity's policy or custom must have played a part in the violation of federal law. *Id.* A plaintiff proceeding under § 1983 must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but also that the policy or custom itself was unconstitutional. *Luckert v. Dodge Cty.*, 684 F.3d 808, 820 (8th Cir. 2012). The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity may possess. *Graham*, 473 U.S. at 167.

Viewing the record evidence in a light most favorable to Mr. Glasper, the only interaction that Mr. Glasper has ever had with either Officer Wright, Jr., or Officer Wright, Sr., occurred on November 22, 2014, and Mr. Glasper knows nothing about Officers Wright, Jr., or Wright, Sr. (Dkt. No. 28, ¶¶ 77, 80). Prior to November 22, 2014, Mr. Glasper had not had any interactions with law enforcement officers for the City of Hughes nor had he ever heard anyone complain about

Hughes Police Officers (*Id.*, ¶¶ 78, 79). Mr. Glasper admittedly has no first-hand knowledge about how the City of Hughes hires, supervises, or trains its police officers (*Id.*, ¶¶ 81-83). In addition, when asked in written discovery to identify specifically how the City of Hughes violated his rights, Mr. Glasper simply reiterated his factual assertions regarding the events of November 22, 2014 (*Id.*, ¶ 94).

Mr. Glasper points to the City's lack of written policies as evidence to support his claims (Dkt. No. 36, at 5-6). The City defendants argue that, under *Atkinson v. City of Mountain View, Missouri*, that argument fails. 709 F.3d 1201 (8th Cir. 2013). In *Atkinson*, the Chief of Police, Sanders, was accused of using excessive force against the plaintiff. *Id.* During Chief Sanders' tenure, the city for which he worked had no binding, written policies on any police-related issue, including use of force. *Id.* at 1206. Taking that into account, the Eighth Circuit Court of Appeals found that the plaintiff's "bare allegation that 'the absence of a binding, written policy on the use of force demonstrated deliberate indifference on the part of the City' was patently insufficient." *Id.* at 1216. The Court went further, stating that it had previously "made clear" that "a municipality may not be held liable under § 1983 merely because it 'failed to implement a policy that would have prevented an unconstitutional act by an employee otherwise left to his own discretion.'" *Id.* (quoting *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385 (2007)).

Construing the record evidence in Mr. Glasper's favor, Mr. Glasper has failed to set forth record evidence that sufficiently identifies an unconstitutional practice or custom of the City of Hughes that was the motivating force behind Mr. Glasper's alleged violations. Based on this, the Court finds that the alleged fact that the City of Hughes did not have written policies is not enough to establish a violation of Mr. Glasper's constitutional rights.

### 2. Alleged Deficient Hiring and Failure to Train and Supervise

Mr. Glasper's allegation in his response to the motion for summary judgment about what he contends this case centers around simply is a restatement of his failure to hire, train, and supervise claims set forth in his amended complaint (Dkt. No. 18, ¶¶ 19-22). The inadequacy of police hiring, training, or supervising may serve as the basis for § 1983 liability only where the failure amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

It is well-established that § 1983 claims based on the City's alleged deficient hiring or failure to train and supervise its employees require proof that: (1) the City's practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting them, such that the failure to hire, train, or supervise reflects a deliberate or conscious choice by the City; and (3) an alleged deficiency in the hiring, training, or supervising procedures actually caused the plaintiff's injury. *B.A.B., Jr. v. Bd. of Educ. of City of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012) (citing *Parrish*, 594 F.3d at 997). To prevail, Mr. Glasper must prove that the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City of Hughes can reasonably be said to have been deliberately indifferent to the need. *Id.* Deliberate indifference entails a level of culpability equal to the criminal law definition of recklessness. *Id.* (citing *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004)). Mr. Glasper must also demonstrate that the city had notice that its procedures were inadequate and likely to result in a violation of constitutional rights. *Andrews v. Fowler*, the 98 F.3d 1069, 1076 (8th Cir. 1996) (internal quotation and citation omitted).

An isolated violation by one who is not a final policy maker is insufficient to establish a municipal policy or custom. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality opinion). A chief of police in Arkansas is not a final policymaker. *Lewis v. Thomason*,

No. 07–6033, 2009 WL 426543 (W.D. Ark. Feb. 20, 2009). The record evidence does not support Mr. Glasper's alleged negligent hiring or failure to train and supervise claims.

The record evidence shows that former Chief McCluskey was Chief of Police at the time Officer Wright, Jr., was hired to work at the Hughes Police Department on May 12, 2014 (Dkt. No. 28. ¶¶ 9, 10). At the time of Officer Wright, Jr.'s hire, he was a certified Part-Time II officer, having completed the Part-Time II Course offered by the Forrest City Police Department. (*Id.*, ¶ 6). The Part-Time II Course was a general overlook of law enforcement that offered a certification and went over several points of law enforcement, including but not limited to, over traffic stops, how to approach a car, how to deal with certain people, hostile environments, use of force, weapons, how to handle a weapon, red flags, when people give you drugs, narcotics, and places where people can hide drugs in the car (*Id.*, ¶ 7). Officer Wright, Jr., was also awarded a certificate of completion for successfully completing the "required course of study approved by C.L.E.S.T. for the State of Arkansas" with respect to the use of OC Spray (Oleoresin Capsicum Spray, also known as "pepper-spray") and Use of Force (*Id.*, ¶ 8).

Prior to hiring Officer Wright, Jr., former Chief McCluskey contacted Officer Wright, Jr.'s previous employers, personal references, and business references listed on his application (*Id.*, 11). Officer Wright, Jr., was offered in-house training while he was at the Hughes Police Department, including going through an FTO (Field Training Officer) program with Lieutenant David Boykin, with whom Officer Wright, Jr., rode for about a week or so, and then Officer Wright, Jr., moved on to train with another officer, and this occurred two or three times (*Id.*, ¶ 12). When Officer Wright, Jr., first started with the Hughes Police Department, he could not ride alone by himself; he had to be trained as far as familiarizing himself with the City, the areas and streets, the procedures, getting comfortable with telling people what to do, and pulling people over. After

completing the FTO ride-along program, Officer Wright, Jr., was not allowed to be on a shift by himself until former Chief McCluskey spoke to Lieutenant Boykin and the other officers who trained Officer Wright, Jr., and they were all in agreement that he was ready to be on a shift or to cover a shift by himself.

Former Chief McCluskey resigned as the Hughes Chief of Police, effective May 29, 2014. On June 2, 2014, Kristy Green was offered the position of interim Police Chief for the City of Hughes, and she accepted.

On August 27, 2014, Officer Wright, Sr., applied for employment with the Hughes Police Department and began working part-time for the Hughes Police Department shortly thereafter. The Chief of Police at the time Officer Wright, Sr., was hired was Chief Green. Officer Wright, Sr., attended the Arkansas Law Enforcement Training Academy ("ALETA") from January 5, 2014 to March 28, 2014, and while there, successfully completed the Basic Police Training Course consisting of 480 hours of law enforcement training (*Id.*, ¶ 3). Officer Wright, Sr., was awarded the technical certificate in Law Enforcement from Southern Arkansas University Tech on March 28, 2014 (*Id.*, ¶ 4). While at ALETA, Officer Wright, Sr., received OC Spray training, including the appropriate use of OC spray according to the Federal Law Enforcement Training Center Use of Force Model (*Id.*, ¶ 5). When Officer Wright, Sr., was hired by the Hughes Police Department, he was also working full-time for the Forrest City Police Department ("FCPD") and had worked for the FCPD since August 2013 (*Id.*, ¶ 19). At the time Officer Wright, Sr., was hired, Interim Assistant Chief Richard Haggans told Officer Wright, Sr., that the policies that he was following at the FCPD applied the same in Hughes.

On November 12, 2014, Ritchie Haggans, acting as Assistant Chief, notated that he had conducted a thorough background investigation on Officer Wright, Jr., and Officer Wright, Sr., and found no disqualifiers for employment for either.

Mr. Glasper does not discuss specifically this record evidence, the hiring practices of the Hughes Police Department, or the training received by Officers Wright, Jr., and Wright, Sr., before or during their employment with the Hughes Police Department. He offers no record evidence to demonstrate why the hiring practices and training were allegedly deficient.

Showing that Officers Wright, Jr., and Wright, Sr., were certified and trained, however, is not sufficient to shift the burden to Mr. Glasper to show a genuine issue for trial. Mr. Glasper alleges that former Chief McCluskey and the City breached their duty to supervise and instruct adequately Officers Wright, Jr., and Wright, Sr., on the use of excessive force. *See Anderson v. Roberts*, 823 F.2d 235, 238-39 (8th Cir. 1987). Former Chief McCluskey and the City could be liable for this alleged breach of duty if, once Officers Wright, Jr., and Wright, Sr., were certified and trained, former Chief McCluskey and the City showed deliberate indifference in the supervision and control of Officers Wright, Jr, and Wright, Sr.'s actions. *Id.*

In regard to the supervision Officers Wright, Jr., and Wright, Sr., received, record evidence establishes that at the September 15, 2014, meeting of the Hughes Police Department, Chief Green informed the officers present that she would be leaving for the police academy on Sunday, September 21, 2014. At the September 2014 meeting, Chief Green communicated to the officers present that the schedule would remain the same until December 12, 2014, that no changes would be made unless authorized by the Interim Chief, and that any officer clocking in and out without approval from a supervisor was to be disciplined and potentially subject to termination.

Further, the record evidence is that, at that meeting, Chief Green informed the officers that, if an officer should make an arrest, before the subject was placed in the unit, he or she should be read *Miranda* Rights, handcuffed, searched, and placed in the vehicle with the seat belt in use. It was the policy of the Hughes Police Department to seat belt people who were being transported.

Officers Wright, Jr., and Wright, Sr., were both present at the September 15, 2014, meeting, based on the record evidence. In addition, on October 26, 2014, Officer Wright, Jr., signed the Law Enforcement Code of Ethics, promising in part to "respect the Constitutional rights of all men to liberty, equality and justice." (Dkt. No. 28, Ex. 10).

Mr. Glasper does not discuss specifically this record evidence. He offers no record evidence to demonstrate specifically why he contends the supervision Officers Wright, Jr., and Wright, Sr., received was allegedly deficient.

This Court acknowledges that the Eighth Circuit Court of Appeals has "held municipalities liable under *Monell* when the plaintiffs have produced evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored police misconduct." *Anderson*, 823 F.2d at 238-39 (citing *Mettler v. Whitledge*, 156 F.3d 1197 (8th Cir. 1999) (examining authorities); *Parrish v. Luckie,* 963 F.2d 201, 204–05 (8th Cir. 1992) (reviewing the "detailed and compelling" evidence the plaintiff presented that the defendant police department avoided, ignored, and covered up complaints of physical and sexual misconduct by officers); *Harris v. City of Pagedale,* 821 F.2d 499, 501–06 (8th Cir. 1987) (finding a plaintiff had proven a municipal custom through the presentation of detailed evidence regarding the particular police officer's previous misconduct, and the city's failure to investigate or punish that conduct), *cert. denied*, 484 U.S. 986 (1987)). However, "there must also be some showing that the complaints had merit. . . ." *Rogers,* 152 F.3d at 799 (citing *Handle v. City of Little Rock,* 772 F.Supp. 434, 437 (E.D. Ark. 1991)) (quoting

*Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir. 1987)); *see also Mettler,* 165 F.3d at 1205 ("the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force."). "Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment." *Mettler,* 165 F.3d at 1205 (citing *Vann v. City of New York,* 72 F.3d 1040, 1050 (2d Cir. 1995); *Fiacco v. City of Rensselaer,* 783 F.2d 319, 329-31 (2d Cir. 1986), *cert. denied,* 480 U.S. 922 (1987)).

On the record before the Court, there is no evidence of citizen complaints regarding alleged excessive force prior to this incident. Further, there is no evidence presented to suggest that any complaint regarding such an incident had merit, as required by *Rogers.* For these reasons, the Court concludes that Mr. Glasper has not shown a genuine issue of material fact sufficient to defeat the City's motion for summary judgment on his deficient hiring and failure to train and supervise claims.

Because Mr. Glasper has not shown a custom, policy, or practice of deliberate indifference and has not shown an inadequacy of police hiring, training, or supervising amounting to deliberate indifference, this Court concludes that the City defendants' motion for summary judgment should be granted as to Mr. Glasper's official-capacity claims against the individual defendants and his claims against the City of Hughes, Arkansas.

## IV.     Conclusion

The Court concludes, based on the record evidence taken in a light most favorable to Mr. Glasper, that there are genuine issues of material fact in dispute regarding Mr. Glasper's Fourth and Fourteenth Amendment claims and pendent state assault and battery claim against Officer

Wright, Jr., in his individual capacity. Therefore, the Court denies Officer Wright, Jr.'s motion for summary judgment on Mr. Glasper's claims against him in his individual capacity. The Court grants Officer Wright, Sr., summary judgment on the claims Mr. Glasper asserts against him in his official and individual capacity. The Court grants Mayor Owens summary judgment on the claims Mr. Glasper asserts against him in his official and individual capacity. The Court grants former Chief McCluskey summary judgment on the claims Mr. Glasper asserts against him in his official and individual capacity. The Court also grants the City and the official-capacity individual defendants' motion for summary judgment.

Based on this, the Court grants in its entirety the City defendants' motion for summary judgment (Dkt. No. 27) and grants in part and denies in part the motion for summary judgment filed by Officers Wright, Jr., and Wright, Sr. (Dkt. No. 30).

So ordered this 28th day of August, 2017.

_Kristine G. Baker_

Kristine G. Baker
United States District Judge